Good morning, Your Honors. Andrea Bierstein representing the plaintiffs' appellants in Maya and in the other seven cases consolidated with it. I'd like to reserve six minutes of my time for rebuttal. I'd like to start off by saying, Your Honors, that this is an easier case than the Kang case. I think this is a straightforward fraud case where plaintiffs have alleged that they were qualified buyers who didn't know the truth here. They are alleging that defendants misrepresented and omitted a material fact, and the material fact was that in the developments that they were building from scratch, which didn't exist yet so nobody could go and see what the neighborhoods were like on their own, they omitted and misrepresented that there would be a significant number of high foreclosure risk buyers in those neighborhoods, that these would be economically marginal, sketchy, risky neighborhoods. Now, I'm going to get back to that injury in a minute because I want to talk about what that misrepresentation means, what the injury is, and in particular, the causation concerns that were raised in the previous argument. But before I get to that, I want to say I think it would be unprecedented for this Court to hold that a purchaser, a defrauded purchaser, lacks standing to sue its own buyer, to sue his or her own buyer, that there's any standing concern when a purchaser comes in, sues the buyer, and says, you defrauded me, you misrepresented. I think you mean the seller. I'm sorry. Sues the seller. Exactly. It wouldn't be unprecedented for the buyer to sue himself. But, yes, I think it's unprecedented for a buyer to lack standing to sue his or her own seller. Now, there may be arguments down the road that Defendants would want to make about whether the representation was material and whether there was a duty to disclose it, but that has nothing to do with standing. I think that there is always standing for a defrauded purchaser to sue his or her own direct seller for fraud. Now ---- Is this our counsel? Let's get this all clear. Now, this is Article III standing that you're initially talking about. Is that correct? Yes, it is, Your Honor. Okay. So I do want to talk about the causation concerns that were raised in the Kang argument. But I think before doing that, it's important to identify the injuries, the injuries in fact that I think satisfy the first prong under Article III. And one of the reasons I think it's important to talk about those first is if you get the injuries wrong, it's easy to get the causation chain confused. And I think that's actually one of the things that I think Defendants have misidentified in their papers. There are three distinct injuries that the plaintiffs in these cases allege. The first injury was the injury of having bought homes they would not have bought had they not been defrauded. The plaintiffs are saying we didn't know these were in high-risk neighborhoods. We didn't want to live in high-risk neighborhoods. We would not have bought our homes in high-risk neighborhoods had we known the truth. The second injury is that they overpaid for those homes. And again, they're alleging here there's supposed to be a discount for a house in a high-risk neighborhood compared to a house in a stable neighborhood. But because there was a fraud and nobody knew that these were in high-risk neighborhoods, we paid the premium price you would pay for the same house in a stable neighborhood, and instead we got the risky neighborhood. So we overpaid for our homes. Now, there's a third injury, and the third injury I think is where the Defendants want to focus, but I think you need to understand the third injury is really comes about as the result of consequential damages, which is that the homes have declined in value because the risk, the extra risk, in fact came to pass. And when the thing that you were unknowingly taking the risk of in fact came to pass, there was the additional damage that you suffered when the homes actually declined in value as might have been predicted had you known the truth. Now, I think in this respect there's a really good analogy here, which is to think about if you're buying a house on an undisclosed earthquake fault. So you're in this earthquake zone. You don't know you're in an earthquake zone. It's an undisclosed fault. You're paying for a house that you wouldn't have bought if you'd known it was in the earthquake zone sitting right on the fault in the first place. If you had bought a house on a fault, you would have expected to pay less because you'd expect to get a discount for a house on the fault. Now, those injuries are independent of whether the earthquake ever happens or not. You're just injured when you've done that, and you have standing to seek redress when you get defrauded into doing that. When the earthquake happens, I think you have an additional injury and additional damages that are consequential damages that flow from the loss. And in terms of traditional concepts about proximate cause or loss causation, as long as when the earthquake happens, it's exactly the thing that you were lied to about, you're going to be able to recover those as well. So that's a third form of injury. But it's also isn't the argument with respect to the causation doesn't work. I think I want to ask questions about the role that rescission plays in this case in a way that it doesn't in the Kang case, so that you would say that the misrepresentations alone call for rescission or arguably call for rescission, which suggests that the case has to continue on that ground regardless of the compensation issue. Well, I think that's right. And we had argued in the district court that if nothing else, we had standing to seek rescission. And we were perplexed by the notion that the courts seemed hung up on this idea that you had to have done a resale to realize injury. And we kept saying, but we're also suing for rescission, and you can't have to sell your house in order to seek rescission. It's contradictory. And so that's right. I mean, that is, at the very least, I think our plaintiffs are entitled to rescission. But I think that they're also entitled to an alternative of damage remedies. I think in a fraud situation, you could go either way. And I think that they're entitled to do that. So I think it's important to recognize that this case is not about the unprecedented decline of the housing market, as defendants would have it, or the growth of mortgage-backed securities or the expansion of subprime lending. These are not the factors that are the sources of plaintiff's injury. Plaintiff's injury arises from the misstatements and omissions. We are not suing defendants because they're subprime lenders. We're suing defendants because they misrepresented and omitted when they sold houses that we were buying houses in neighborhoods that were populated by people who were getting subprime loans. And it's the misrepresentation and omission that's key, not the underlying conduct. If they wanted to disclose, if they wanted to sell houses and include disclosures that said, these neighborhoods are ideal if you have trouble qualifying for loans elsewhere because we are making a point of selling homes to people who may not be able to get credit, had they disclosed that, I think we would not have a case. It's the disclosure, it's the failure to disclose, or had they disclosed, this neighborhood is great for investors because these houses may have great rental value. Had they disclosed any of those things, then I think we would not have our case. So this is a question. Kagan. You suggest that in particular there was a misrepresentation with respect to whether or not they were selling to investors. That is one that was a very concrete, affirmative misrepresentation, at least one of the cases where they said we don't sell to investors, and in fact they were making no efforts not to sell to investors. So that is one of the important misrepresentations and omissions. But the high foreclosure risk buyers, which was, I think, more in the nature of an omission rather than an affirmative misrepresentation, I think is also fundamental. It's also key to our case that this was an undisclosed material fact and the argument that the sellers in this case have no obligation to tell you about the bona fides of anybody in the neighborhood and what their economic situation is. Indeed, there are laws that would prohibit that kind of disclosure. Well, I think, Your Honor, the problem with that argument is we've never suggested that they had an obligation or a right to tell us about the financial bona fides of anyone in particular or even to identify them by house. That is to say, this neighborhood has a lot of people who qualify for subprime loans. I don't think violates anybody's privacy. It doesn't identify by house, by name, by demographic in any way who those people are. And as I say, there are many ways to make that disclosure, including this is the ideal place to live if you have trouble getting credit elsewhere. That might have been a disclosure. That couldn't possibly violate anybody's privacy rights. And so I think the law is not a violation of anybody's privacy rights. Ultimately. I think you can remove when you do discovery in a case, you can remove the some identifying information if you take the names off the files or you keep files sealed. I mean, I think to demonstrate that there were, you know, a huge percentage of high foreclosure risk buyers can be done in a way that doesn't plaster the names of the people who shouldn't have gotten loans in a public court file. I think it's more of a statistical. We need to know how many there were in any particular neighborhood. We don't need to know their names. And if we do need their names to take discovery from them, I would assume that that would be under seal. We have court rules about not filing people's home addresses or personal identifying information. So I think that could be done in that way. So what's the nature of the disclosure you think should be required in any case? You think any lender who lends to a development has to disclose the conditions, the mortgages, as a general rule that they're going to extend? Well, I don't think that in general that would be the case. I mean, in California, under the common law, the test is a material fact that has to be disclosed is one that would affect the price or desirability of the property. I think what was unusual in these cases, which gave rise to the duty of disclosure, is defendants were building these developments from scratch. So this isn't a situation where you're selling a few houses in a neighborhood and maybe you don't really know who the rest of the neighbors are. So first, they're building the developments from scratch. Second of all, they have the captive mortgage company, which is making, and this was referred to in the previous argument, in the Kang argument, 90 percent of the loans. They had an unusual amount of information about who was buying into this development that you normally wouldn't have. That is, a seller who's not also the lender is not going to know whether there's 90 percent of the people who – well, I'm not saying all 90 percent were unqualified, but what the high percentage is going to be. But I think if the seller does know that – I mean, I think any fact the seller actually knows and knows you don't have access to, that's going to affect the value of the home. Now, if there are three unqualified buyers in a whole neighborhood, no, I don't think you would disclose that. But when you know from your own mortgage files that an enormous percentage of these people can't afford the houses you're selling to them, and I think that what we will show, ultimately, I think what discovery will show is they knew the people couldn't afford the homes, not just because they were making the loans, but because part of their marketing was to sell the houses to anyone, whether they could afford them or not, just to keep them moving. If they know that the people can't afford the homes, yeah, I think they have – in those circumstances, they have a duty to disclose that this – as I say, that this is a neighborhood for people who may have marginal credit issues. And that misrepresentation is conveyed by the representation, I mean, that it would be a stable environment. In other words, I think we want to identify what is a material misrepresentation from what is an omission. The investor issue you're saying is an affirmative misrepresentation, and the omission is along the lines that stability is inconsistent with the pattern of the people they sold it to? Well, I think the omission is independent of anything they said. That is, I think they had a duty to disclose it, regardless of what they said, because I think it had material effect on the property. But I also think that when they said stable, traditional neighborhoods, those statements were misleading because they omitted additional information necessary to make them not misleading, and that additional information would have – or that contradicted them, that that additional information would have been that, well, you know, they're stable and traditional, except that the people are not traditional homebuyers because they can't traditionally qualify for a mortgage. So I do think that was a misrepresentation, and I think it was a misleading statement. But I think even in the absence of that, we would argue, we've alleged that there was a duty to disclose the financially risky nature of these neighborhoods separate and apart from anything else that was misrepresented. I realize we're departing from standing and talking a bit about the merits of it. But in the California market that occurred at that time, in fact, that was happening all the time. It was – whether it's a condo development here in San Francisco or the development you're talking about, in fact, people were extending credit, and as long as that housing market continued to rise, there wasn't a problem with it. So the representation of stability might well have been true at the time. Well, I'm not sure that there wasn't a problem in the sense that – and I think each situation may have been different, but I think the problem in these developments is these people couldn't afford the payments, period. I don't – at least I think a large percentage of them. And whether or not the earthquake ever happened, that is, whether the housing bubble had never burst or the economic downturn hadn't happened, if the people all in your neighborhood have mortgages they can't afford, they're going to stop paying, even if they don't lose their jobs. That is, it's one thing to say, you know, things got bad because people lost their jobs, they're going to stop paying. It's another thing to say, these people didn't qualify for their loans to begin with, they couldn't afford the payments, they were going to default. And even if the rest of the economy had been rosy, these developments would have been devastated by all of those defaults and foreclosures because these people couldn't afford their houses. So I don't think it's really a question of, you know, there may have been, you know, buildings here and there where they were – where there were inflated prices and overselling, but if people could afford the house or the condo, the problem would have been a different issue, I think. You have about four minutes left. Do you want to reserve? Yes, I did want to reserve that. Thank you. Good morning, Your Honors. May it please the Court, Nathaniel Garrett for the defendants' appellees in these aid-consolidated actions. Your Honors, the defendants have the disadvantage of shooting at a bit of a moving target. In the district court, trial counsel focused on – primarily on the defendants' lending practices. That's evident from the complaint, and that's evident from their briefs to the district court, where they argued that their damages were, quote, a result of the defendants' practice of flooding plaintiff's neighborhoods with high foreclosure risk buyers. The strategy has now changed a bit on appeal, and now they focus primarily on the misrepresentations, but still that doesn't work, and for this reason. The plaintiffs say it would be unprecedented not to find standing here. In fact, as far as my research reveals, it would be unprecedented to base Article III standing on transaction causation rather than on the kind of injury-producing causation that Article III requires. And let me explain what I mean by that. Transaction causation means you made a misrepresentation to me, and that's why I bought this stock, that's why I bought this house, that's why I bought this product. It's akin to reliance. Injury causation is something different. It means when the truth of that misrepresentation became clear, that's why I lost value. And here the plaintiffs have to prove both. Instead, they want to – at least in the briefs, they're arguing all they have to show is we relied on the misrepresentations, that's why I bought. You have to go a step further and then ask, if those misrepresentations were absent, would the injury still have occurred? That's what cases like Allen v. Wright, Simon, Worth v. Selden teach. It's – So along that line, why isn't it a cognizable injury to say that increased risk of harm is sufficient damages to confer Article III standing? I've been thinking, for example, like our decision in Crotner v. Starbucks, which is not a real estate case, but that's one where the laptop was stolen and the argument was made, look, nobody suffered any damage, and the argument is, well, we have a risk of damage, and that's sufficient to confer standing. So what's – why isn't risk alone sufficient to confer standing? Well, it's a contextual inquiry, and in the Wright case, maybe it would be. But if you look at the complaint, it's not a complaint about risk. Remember, this is a complaint pled as a class action. And what trial counsel focused on were things that they would be able to prove on a common basis. And so if you look at paragraphs like 48, they're looking at paying an inflated price. What they're talking about is paying too much money for their home. And so then the question arises, did they pay too much on that first day because of the risk? I suppose that's the case. But California law allows, not all States, I think, would, but California allows an overpayment theory of fraud. Correct, Your Honor. But on day one, according to their own allegations, there was no injury. They say in paragraph 31 that the price actually went up after they bought their homes. The injury, if it occurred, occurred sometime later when the prices around them started to go down and they lost value. So imagine if Ms. Stevens, for example, bought her home. Six months later, she decides she wants to sell. According to her, the market is hot because of the defendant's lending practices. If she had made $100,000 on that – on that sale, would she have standing to sue here? I submit on these kinds of allegations, no, because what they're complaining about is an inflated price, is paying too much money for that home. So the injury really occurs later. And in paragraph 48, it makes this clear. It occurs when the foreclosures and short sales in their communities begin to happen. And there's really two problems with causation, and we've only touched on one. So I'd like to try to touch on them both. One is one that Judge Gertner has already touched on, which is essentially the sort of but-for causation. You know, if you took this conduct away, would the injury still have occurred? We submit not for a variety of reasons. One of them is, according to the plaintiffs, the reason these foreclosures and short sales began occurring was because the housing market started to collapse. And so individuals had trouble paying on loans that the interest rates went up. Well, that's just one example of numerous factors influencing why interest rates are going up on a – on a national or global level. But there's a second element of causation, and it's touched on in the brief but not really developed, and that is, to what extent is Article III causation like proximate cause? And they cite cases saying, well, it's not proximate cause. But if you trace those cases back, they all go back to Bennett v. Speer. And what Bennett v. Speer says is, you can – you can – you can base standing on an indirect cause if it, quote, had a determinative or coercive effect on the direct cause. So you've got cases like San Diego County, for example, Judge Fletcher's case, where the U.S. Government put limitations on the sale of semiotic automatic rifles. There's no question that is a but-for cause of why the price of those rifles go up. I mean, absent the Federal legislation, you don't have a problem. But the Court's point was, yes, but there's an independent determination being made by an intervening party, the manufacturers, the dealers, to actually raise the prices. That's an independent decision being made, and it's not coerced by what the government did here – did in that case. We submit as the same inquiry here. It's not determinative and coercive, and you know that, because not everybody who took a loan from the eight largest homebuilders in America foreclosed on their houses. There are numerous independent things going on. But what – what – this goes back to the issue of amending. If an economist, if an expert would be able to disentangle the damage that was attributable to your clients and the damages that were attributable to the market, why shouldn't that be part of the element of proof? Why shouldn't they be able to arguably amend to do that, and that becomes part of the proof? If it is as you describe it, they will simply lose. Well, I mean, there's two points there. One is practical and one is legal. I mean, as a practical matter, they've already amended once. They had the same motion to dismiss, the same grounds. They amended. They took their best shot. And then at the hearing, they did explain what their expert would have shown. They had an opportunity to explain it, and they did. And what the district court said is – it was very sympathetic and said, I will actually consider whatever you say here as an allegation. I'll assume you're putting it in the complaint. That's at ER 253, I believe. And so they had an opportunity to say, this is exactly what we would put in our complaint to solve the problem. And their explanation was, we'll have an expert look at zip codes in Southern California, compare those zip codes as they appreciated during the hot market, compare their depreciation over the downturn, and then look at how much subprime lending was going on there. And we'll attribute any difference in depreciation to the subprime lending and thus the defendants. I mean, there's numerous problems with that analysis. The district court hit on one of them, which is there are clearly reasons other than just subprime lending that communities with lower-income residents, lower-value houses might suffer more during the economic downturn, which is, of course, what happened. But I think it's very akin to Miller v. Yokohama, the Ninth Circuit opinion, where it said if you voluntarily amended once in response to the motion to dismiss and you have an opportunity to then explain further what you would do, the district court doesn't have to go further than that. I mean, if you've had an opportunity and then you have an additional hearing to explain what you would do and you still can't solve the problem, you don't have to go and ring around the rosy and keep going through that exercise. I'm sorry. No, no, go ahead. No, no. I mean, the standard is an Article III standing standard. This is actually one of the issues in your case, not a 12b-6 standard. And so the question is, the question is a much lower threshold issue of causation than you might have to ultimately prove at trial and arguably than you would even have to prove in a 12b-6 setting. If it is conceivable, if it is imaginable, if there's a – I'm not sure what the terms of art are, that they could make this link, why don't we give them the right to try? I'd put it a slightly different way, Judge Gertner. I think that they have to make the same type of showing, but it's within an easier procedural setting. In other words, the causation standard is the same. It has to be fairly traceable. They just get to do it with allegations as opposed to proof. And arguably affidavits. And arguably affidavits, certainly. And so would this have been helped if there had been an affidavit from their expert? Not saying what they said it would say, Your Honor. Not comparing the zip codes. But my problem, I think, is similar to Judge Gertner's, and that is there are different gradations of proof required. You have Stanny, you have 12b-6, and you have summary judgment. And essentially what the arguments are in this case are what I would categorize as traditional summary judgment arguments, which is there are alternate theories of causation. There can't possibly recover. And I understand that. But from a Stanny perspective, looking at the four corners of the complaint, why do you think we should look outside the complaint and say, okay, but we know that there are other, it's a complicated economy, there are other forms of causation. Why should we do that? Well, I think for the same reason that the Court looked to common sense in other dismissal cases, like San Diego County, like Allen, like Worth. You're allowed to use common sense to say, here's the substance of the claim. And using common sense, is that something that you're going to be able to prove up? So, I mean, again, I think that they can, you have to accept the allegations as true. But it's not, I mean, it may not be Mount Everest, Your Honors, but it's not Mount Tamalpais either. I mean, they have to allege specific facts. After Twombly, this Court has applied Twombly and Iqbal to standing in a case called Chapman v. Pier 1 Imports. So the allegations do have to be plausible. Counsel, in that Chapman case, it was just kind of a throwaway, you know, footnote. It wasn't. I wouldn't put a lot of weight on that. Fair enough, Your Honor. It wasn't a footnote. In my mind, that footnote suggests you apply Twombly to standing. That's what the Court did. What would we, theoretically, why would we do that? Well, I don't, there's a vast difference between constitutional standing and pleading requirements under 12b-6, it seems to me. Well, but Article III standing does incorporate, as I said, it does incorporate notions like proximate cause. Whether it's exactly equivalent to proximate cause or not, it's something akin to it. And proximate cause does ask a discretionary question, which is, is this injury fairly traceable to the defendant's conduct? I mean, can it be fairly traceable? Not just is it, it is, can it be fairly traceable? And if they have a theory that traces it, unless that theory is far out and impossible why wouldn't we give them an opportunity to prove it? Well, I don't, I mean, again, cases like San Diego County, it's the question whether it's impossible or it's the point that no matter what the government did in this case, there are other intervening causes that caused this, and the government did not have a determinative or coercive effect on that behavior. And we do think that's the same situation here. What about the argument, the one, the fault argument, which as someone from New England, I really worry about? Which is that if the risk that you were not warned about came to pass, and so arguably the risk is here, that whatever else was going on in the market, this area was going to fall lower because of the nature of the practices, and that came to pass. Right. I actually agree with Plaintiff's counsel in that example. And to give, I spent some time in western Massachusetts, so you could have an example of, you know, flooding in the winter or something like that. If a, absolutely, if a home seller makes a misrepresentation about there's no leak in the basement, the foundation is perfect, you're not on an earthquake, you're going to have Article III standing there, because you're going to have an injury, but according to Dura, you're going to have that injury when the misrepresentation becomes known to the plaintiff, and you're going to have causation because there's nothing standing in between the content of that misrepresentation and the impact on price. The reason the price goes down eventually is because you have figured out the content of that misrepresentation, and you now need to disclose it to the next seller, and they're not going to pay as much. Our point here, and the reason why this case is different, is it may be that they have alleged that the reason they bought their house is because of what the defendants here said, and we can fight about that later if the case is remanded. But the critical point at this stage is that it's, it's, they have to rely on speculation in order to show that the content of those misrepresentations is the reason there were short sales and foreclosures in their neighborhood. Or exacerbated the harm. In other words, it seems to me that's what their expert is talking about. It's not cause, but made worse. And if they can identify the made worse, why shouldn't they be allowed to? Well, I think that's fair. And if they could, but again, according to what the – well, two issues. One, according to their expert, I don't think they can do that. I mean, they have explained no way – if you look at a ZIP code in Southern California, there's going to be hundreds of thousands of homes in that ZIP code. The defendants of which are going to be responsible for at most a couple hundred. They propose no way of actually divvying up whose lending practices are worse, who's, you know, who's responsible for whom. I think there's additional problem. I mean, if you even got the best expert in the world who could get down into an individual basis and look at a home and say, okay, Ms. Stevens, you live next door to this individual, and this individual bought a home through a home builder, took out a mortgage, and he could pay it, but then he lost his job. And he could still pay it. He had to stretch himself. But he decided because the home market has plummeted, my home is now actually worth less than my mortgage, and I'm going to walk away. That's a calculated decision I'm going to make. How does any expert decide, I'm attributing this to the home builder because you made the loan. I'm attributing this to the employer because you made the decision to fire. I'm attributing this to the home buyer who made a decision to walk away. And I'm attributing this to the actual entity that has the loan and made the decision to foreclose, which we know is not these defendants because according to the plaintiff's allegations, we sold all the loans. So that's a one- But wasn't it simply routine fault allocation? I mean, we, juries consider a multitude of causations in cases all the time, particularly in environmental cases. Well, maybe direct causes, Your Honor, but that takes us to the second problem, which I highlighted, which is that there are two causal problems you have to resolve. One is that but-for, and the other is the intervening causes. And as we set out in the brief, all of those decisions made by other parties create intervening causes. It's like San Diego County, and it's much like the Hobacker case from the Tenth Circuit, which both parties cite. And in that case, an individual sat on a local board, and the board said, we're going to start saying the Pledge of Allegiance. And the individual said, I don't want to. I, you know, for various, various reasons, and he didn't, and a recall petition was started. There's no doubt that recall petition was started because he wouldn't say the Pledge of Allegiance. And individuals voted him out, and he sued that board, saying, you are the reason I get kicked out. If it wasn't for this pledge, I wouldn't have gotten kicked out. And the Court said, that may be so. I mean, without – well, to be fair, they didn't quite address it, but I think it's quite clear. Without that, without that initial step requiring him to say the Pledge of Allegiance, there would have been no recall. But they still said no standing because there's this intervening decision of people to actually vote you out. And you have to rely on speculation to show that they voted you out because you wouldn't say the Pledge. Well, perhaps, and particularly as a matter of proof. But it seems to me what their argument is in this case, or their theory is, that your client had some knowledge of the probability of the intervening forces and made an affirmative representation to the contrary. And I realize your clients dispute that and will dispute it. And if you got to trial, you might be able to win that point. But isn't that their theory, is that you acted with knowledge of the intervening causes. You marketed it knowing that that was true under their alleged misrepresentations. And therefore, you can't rely on the intervening causes of which you knew to defend yourself in terms of standing. I don't know how much there is in the complaint, if you actually get into it, about the knowledge we had. I mean, the only knowledge that's actually alleged is that, you know, we falsely stated the neighborhoods were stable or that we were selling to investors. There's no allegation that we had the foresight that we knew it was going to happen. Of course, that's backwards. I mean, these are defendants that their whole business is selling homes. I mean, their business suffers critically when the home value goes down. This isn't Coudere brothers, who this is one. But Judge Levis made a very interesting point, which is to say the representations that the defendant makes in this case are not the representations of the, you know, dime store owner. It's the representations of someone who sets prices, sets a marketing strategy, having in mind all the intervening causes, having in mind that there are other players. That's how they make their decisions as to how to do things. And so if misrepresentations or omissions were made, you know, having in mind what the intervening causes might be, why isn't a standard fraud case? Well, I don't see any. I mean, I don't see any difference in terms of Article III causation to San Diego County or Haubecker. I mean, of course, the government would know that banning semi-automatic rifles would have effects on grandfathered ones. That may have even have been the point. And just as in Haubecker, I mean, they may have anticipated, they may have been trying to goad this individual and anticipated that, you know, making him say the Pledge of Allegiance when he didn't want it was going to get rid of, you know, somebody on the board they didn't want. But that doesn't mean that you can still blame that indirect cause unless, according to the Supreme Court, there was a determinative end course of effect flowing from the indirect cause to the plaintiff. But their theory here is, if we take them at their word, is misrepresentation, and that's the direct theory, the representation, I assume, with knowledge of perhaps the effect of the intervening causes. Well, but let me just emphasize this again because I think it's the most important part of this appeal now that they've changed their theory. The you cannot simply allege that you relied on a misrepresentation and that's why you bought the home and, therefore, you have Article 3 standing. That's transaction causation. I'm not familiar with a single case that has ever held that sufficient. They have to go that step further. They have to show that that misrepresentation, the content of it, was the reason that their home values went down. Well, and also they've, I mean, they've alleged overpayment, which is recognized in California's. Well, it's recognized in California's that damages inquiry. And I think this is how it works. A home, you know, a home seller doesn't reveal the earthquake fault. And when the buyer finds out about that, that's a measure of their damages. But if you want to put that in terms of standing, according to cases like Dura, the injury occurs when the misrepresentation becomes known. And because there's an injury there, your value is worth less now because of that misrepresentation. Now that you know that it's on an earthquake fault and you have to disclose that, your home is worth less. I struggle to see Dura's application to this case just because Dura is a situation where the securities price is created by the market and these disclosures have a one-to-one correlation with the price of the securities. It seems to me that asking for Dura-like standards in a complicated economic situation like this is creating a very high standard for causation. Well, I know you grappled with Dura in the standing context, Judge Gertner, and I think it is a complex issue. I think in many ways, I think the Dura analysis goes more to injury in fact and when that injury arises. And our point on that was that they were not actually injured on day one. In fact, they say they started to make a profit initially because the price of their home went up. And the real point about Dura in terms of causation is not so much a securities point, it's actually a point based on common law fraud, which is a misrepresentation may be a, quote, necessary condition to injury, that's the term the court uses, but you have to go further in common law fraud and show it was actually the cause then of the injury. And we're saying in the standing context, it works the same way and I'm not familiar with any authority saying differently. I'm out of time, so unless there are any further questions, I'll stop there. Judge Fletcher, do you have a question? No, no. We'll let you off the hot seat. All right. Thank you, Your Honors. Thank you. Just a couple quick points. I did want to mention in Barnum-Timber, because we haven't talked much about that case and I do think it resolves a lot of the issues, but I just wanted to note that Barnum-Timber seems to recognize that there's a much lower standard for Article III standing at the pleading stage than there would be at the summary judgment stage. So for all the discussion about affidavits, I'm not sure to what extent. I mean, obviously, if we needed to, we would put in affidavits. We offered to do that. The district court denied our request. But I think under Barnum-Timber, the pleading allegations here should be sufficient. I do want to clarify something. The defendants are arguing that there was no injury on day one, and I think that's wrong. I think there was injury on day one, and I think we can see that in a couple of ways. First of all, in terms of the rescission claim, I mean, we're alleging that we bought houses we never would have bought if we'd known what kinds of neighborhoods they were in. And that's not a new theory. That's in our complaint that we were at, this is at Excerpts of Record 268, plaintiffs were misled into purchasing homes they would not have purchased if there had been proper disclosure. Had we known enough to know the truth on day one, we would have had a right to rescission immediately. We didn't need to wait for any market developments to happen to give us the injury of having bought a home we wouldn't have bought and having the right to give it back. To the extent that we overpaid because we paid the premium or we didn't get the discount for the risky neighborhood, that injury was complete on day one as well, and we would have been able to recoup it. And that's not a matter of complicated expert analysis in terms of ferreting out factors. I think that's a question of historical data on what the difference in risk premium was in neighborhoods that were stable and traditional versus kind of sketchier, economically sketchier neighborhoods at the time. And I think that injury was immediately complete. So it's really only the third injury, the consequential damages, that there's even a question about at what point those were realized. And I think any time you're talking about consequential damages, you're going to have some additional events. But I don't think that's the point. Roberts, at what point in the development did your clients purchase the properties? Varying points. I believe it's – well, it's varying points, and there are – it's different developments in the different cases, and there are multiple plaintiffs. And so there may be some issues as to that, but the notion that they could have resold at a profit I think presumes that if they knew the truth, they would have concealed it, because if they had told the truth, they couldn't have resold at a profit. And also, I think it's based on the idea that the truth hadn't come out yet. That is, as long as the lies were perpetuated, but the first two injuries were already complete. So I don't think that it's the case that there was no injury on day one. As far as – Well, it would be if there's no further sales, if you're the first buyer. Excuse me? If you're the first buyer in the neighborhood, potentially there's no injury on day one. If you're the last buyer in the neighborhood, you presumably know what the neighborhood's like. So it does make a difference in terms of analysis. Not necessarily, because if the neighborhood is pre-sold before the houses are built. I mean, if you're doing a whole plan development and everybody's buying from a sales office based on a picture. Right. I said if you're the first. Well, even if you're the last buyer, there are still no houses. There are still no people. You're still looking at the same pretty picture. You're still not walking around the neighborhood and seeing who lives there, because even if you're the last buyer, it doesn't mean the houses have actually been built. I did want to mention, because defendants have talked about the San Diego County case, and I have about 15 seconds to say this, I think in Barnum-Timber, the Court did a good job of distinguishing San Diego County gun rights from Barnum-Timber, and in particular in distinguishing the notion of issues of price in the market as a whole that the plaintiffs were not in and sort of hoped to be in, versus value of the plaintiff's own property, which is what we're dealing with here. So I think that that distinction governs here as well. And the last thing I would say is we don't believe the Court should reach any of the alternate grounds. The Court hasn't asked any questions about the alternate grounds, and unless you want to ask me about them, I'm going to sit down. Roberts. Judge Fletcher. Nothing more. Mr. Gardner. Nothing. All right. Thank you, counsel. Thank you. Thank you both for your arguments. It's an obviously very interesting and important case, and we'll be in recess. I'll stand right here. All right.
judges: Gertner, Fletcher B. , Thomas